THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMUEL ASHFORD, Defendant-Appellant.

(No. 58114;

First District (3rd Division)—February 7, 1974.

James J. Doherty, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Dennis O'Hara, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

In a trial without a jury the defendant, Samuel Ashford, was found guilty of attempt armed robbery and aggravated battery using a deadly weapon. He was sentenced to three to six years in the penitentiary for each offense, to be served concurrently.

Ashford contends that his identification was the result of an illegal

show-up, and that he was not proved guilty beyond a reasonable doubt because the identification testimony was uncertain, the State's witnesses lacked credibility and his alibi was unimpeached. He also argues that he was improperly sentenced for offenses arising from the same conduct, and that the two sentences imposed upon him were not in accord with the provisions of the Unified Code of Corrections.

The State concurred in the last contention. Accordingly, the day after oral argument was heard by this court, we entered an agreed order for a change of *mittimus*. The defendant's sentence for attempt armed robbery was reduced to two to six years, and his sentence for aggravated battery was reduced to one year and eight months to five years. The other issues between the parties remain in contention.

Near three o'clock on a Sunday afternoon, Mrs. Melissa Rogers, who lived at 2106 South Harding Avenue, Chicago, was walking across the alley next to her house when she saw a man, later identified as the defendant, walking down the alley holding a $2'' \times 4''$ board which was about four feet long.

A few minutes later, Clinton Moses, who lived nearby, was walking east on 21st Street between South Pulaski Road and South Harding Avenue. He approached the same man who had been walking slowly in front of him. As the two men neared the entrance to the alley adjacent to Mrs. Rogers' house, the man turned, grabbed Moses by the collar and demanded his money. Moses stumbled and fell backwards. The assailant struck him with the $2 \times 4$. While lying on his back, Moses threw up his legs and raised his arms in front of his face to protect himself from the blows.

Mrs. Rogers and her 14-year-old son, Leonard, heard the commotion and ran into the alley. Frank Smith, an elderly neighbor of Moses, was there ahead of them. Smith and Mrs. Rogers tried to stop the attack. Smith swung an old bicycle frame at the assailant and Mrs. Rogers threw the lid of a garbage can at him. The man backed away and fled south down the alley. Before he reached the end of the dead-end alley, he turned west into a gangway. The gangway led to the back door of the Playgirl Lounge, a tavern located on the east side of Pulaski Road.

Moses' son Daniel, a patrolman for the Evanston Police Department, was at home the day of the assault. His mother heard the noise and sent Daniel to check on it. He reached the scene in time to hear his father describe the assailant to the police, who had been summoned by Mrs. Rogers.

Daniel Moses immediately began to look for the assailant. He used the description given by his father: a black male, approximately five foot six or seven inches tall, weighing a hundred and forty-five pounds, with

a dark complexion, beard and medium Afro hairdo, and wearing a light knit shirt and dark pants possibly dark brown. He found no one that day who fit the description. The next day he saw a friend and gave him the description. A person who was with the friend told Daniel that he had seen a man who answered the description the day before standing at a liquor store on Pulaski Road. The informant, who was never identified, suggested that Daniel should look for the man at the Playgirl Lounge. He accompanied Daniel to the lounge.

At the Playgirl Lounge, Daniel Moses saw the defendant, who fit the description of the assailant, working behind the bar. Daniel went back outside to talk to the informant. Robert Reed, a part-owner of the lounge, came out to see what the discussion was about. He told them that Ashford could not have been involved in the crime because he had been tending bar the day before for the entire day. Reed called Ashford outside and Ashford denied having had anything to do with the occurrence in the alley.

Reed then suggested that Ashford accompany Daniel to his home so that his father could see him. Neither Reed nor Ashford was aware that Daniel Moses was an off-duty policeman. Ashford agreed to go.

When they reached the Moses' home, Daniel called his father out to the porch. He asked his father if Ashford was the man who had attacked him and his father said he was. Daniel showed Ashford to Leonard Rogers who also identified him. Daniel then told Ashford that he was a police officer, placed him under arrest, informed him of his rights and handcuffed him. Mrs. Rogers was called by one of her sons. She stood across the street and identified Ashford as the assailant. She testified that she was unaware of the handcuffs at the time she viewed him. Chicago policemen arrived about ten minutes later.

At the trial, Clinton Moses, Melissa and Leonard Rogers positively identified Ashford as the attacker. However, Frank Smith was unable to pick him out after twice looking around the courtroom.

Ashford testified that he was the sole bartender at the Playgirl Lounge from noon to seven o'clock on the day of the offense and that he did not leave the lounge at all that day. His testimony was corroborated by James Jones, a part-owner of the lounge.

The defendant contends that the State witnesses lacked credibility because of outside influences that affected their testimony. He argues that Clinton Moses could not have seen the assailant clearly because his arms and legs were covering his face during the attack, but that he identified the defendant to demonstrate his faith in his son's ability as a police officer. He suggests that his identification by Leonard Rogers was incredible because the youth did not want to disagree with his mother or

disappoint Daniel Moses, his neighbor and friend. However, Leonard identified the defendant before his mother did and he disagreed with his mother on several other matters. The defendant further suggests that Mrs. Rogers' testimony was motivated by her desire to have someone convicted for the crime so that her neighborhood would appear to be safe again, and that her testimony was impeached because she denied having a conversation with the State's Attorney prior to the trial, a conversation which did take place.

■■ The credibility of witnesses is a determination uniquely suited to the trial judge who can watch the witnesses as they testify and assess their credibility not only by what they say, but how they say it and by their inflections, expressions, demeanor and mannerisms. Because of this advantage, reviewing courts do not substitute their opinion of the credibility of witnesses unless the trial court's assessment was obviously erroneous. The suspicions, contentions and suggestions of the defendant furnish no sound basis for disagreement with the trial court's assessment of credibility.

The defendant filed a motion to suppress the testimony concerning his identification. The motion was heard with the trial evidence and was denied. He contends that the denial was error; that the confrontation in front of the Moses' home denied him due process of law, that it was an inherently prejudicial show-up and so suggestive as to lead to an irreparable mistake in identification.

■■ Even if it were to be assumed that the defendant's appearance before the identification witnesses was involuntary and the confrontation with them suggestive, the evidence shows that the witnesses had sufficient opportunity to observe the assailant independent of the pre-trial identification procedure. A prior independent origin of a witness' identification can furnish insulation against a subsequent suggestive confrontation. (*People v. Mays* (1971), 48 Ill.2d 164, 269 N.E.2d 281; *People v. Sanders* (1972), 5 Ill.App.3d 89, 282 N.E.2d 742.) The witnesses saw the defendant in broad daylight—Mrs. Rogers saw him twice that afternoon—and they were close to him for several minutes. They were able to describe him in detail after his departure. Their excellent opportunity for observation made their in-court identifications admissible.

In view of the positive identification of the defendant by three credible witnesses and the evidence of his proximity to the scene of the crime, his alibi and Frank Smith's inability to locate him in the courtroom do not raise a reasonable doubt of his guilt. Nor does the fact that he voluntarily submitted to a show-up. His employer suggested that he go with Daniel Moses and gave him time off from work to do so. If he had refused to face the victim of the crime he would have appeared guilty in the eyes of

his employer. Under this circumstance, his taking a chance that he would not be recognized was neither improbable nor contrary to human experience.

■■■ The defense contends that the imposition of sentences for both attempt armed robbery and aggravated battery was improper because they arose out of the same misconduct. The statutory definition of conduct is "an act or a series of acts and the accompanying mental state." (Ill. Rev. Stat. 1971, ch. 38, par. 2—4.) When different offenses are included in the same act, only one sentence may be imposed. The use of force or the threat of the imminent use of force is an essential element in the crimes of robbery and attempt robbery. (Ill. Rev. Stat. 1971, ch. 38, par. 18—1(a).) It is the element that differentiates robbery from theft. If a battery takes place in the course of a robbery the question arises whether this use of force was part of the robbery or separate from it. Often, the distinction is not easily made. If the battery immediately precedes the robbery it is normally held to be a component of the robbery (e.g. *People v. Randolph* (1972), 4 Ill.App.3d 277, 280 N.E.2d 774); if it follows the robbery it is usually regarded as a separate offense, *e.g. People v. Baker* (1969), 114 Ill.App.2d 450, 252 N.E.2d 693.

■■ Ashford was demanding Moses' money as he hit him with the 2 × 4 board. The force was used to effectuate the robbery. The battery and the robbery attempt were intertwined; neither offense was completed before the other. There was only one act of misconduct and only a sentence for attempt armed robbery should have been imposed.

The sentence for the attempted armed robbery is assailed as being contrary to section 8—4(c) of the Criminal Code, as amended January 1, 1973 (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 8—4(c)). Prior to the amendment section 8—4(c) read as follows:

"(c) Penalty.

A person convicted of an attempt may be fined or imprisoned or both not to exceed the maximum provided for the offense attempted but, except for an attempt to commit the offense defined in Section 33A—2 of this Act,

(1) the penalty for attempt to commit treason, murder or aggravated kidnaping shall not exceed imprisonment for 20 years,

(2) the penalty for attempt to commit any other forcible felony shall not exceed imprisonment for 14 years, and

(3) the penalty for attempt to commit any offense other than those specified in Subsections (1) and (2) hereof shall not exceed imprisonment for 5 years." Ill. Rev. Stat. 1971, ch. 38, par. 8—4(c).

The legislative purpose in amending the statute was to conform the

penalties for attempted offenses with the sentencing provisions of the Unified Code of Corrections which became effective on January 1, 1973. (S.H.A., ch. 38, sec. 8—4(c), 1973-1974 supplemental notes, p. 30.) As amended, section 8—4(c) is in the following form:

"(c) Sentence.

A person convicted of an attempt may be fined or imprisoned or both not to exceed the maximum provided for the offense attempted but, except for an attempt to commit the offense defined in Section 33A—2 of this Act,

(1) the sentence for attempt to commit murder shall not exceed the sentence for a Class 1 felony;

(2) the sentence for attempt to commit treason, or aggravated kidnaping shall not exceed the sentence for a Class 2 felony;

(3) the sentence for attempt to commit any other forcible felony shall not exceed the sentence for a Class 3 felony; and

(4) the sentence for attempt to commit any offense other than those specified in Subsections (1) and (2) hereof shall not exceed the sentence for a Class 4 felony."

It can be seen that there are two provisions which apply to attempts to commit offenses other than those specified in subsections (1) and (2). Subsection (3) applies to attempts to commit a forcible felony (other than murder, treason and aggravated kidnapping) and armed robbery is a forcible felony. On the other hand, subsection (4) applies to attempts to commit *any offense* (other than murder, treason and aggravated kidnapping) and armed robbery is such an offense. The defendant argues that he is entitled to be sentenced under subsection 4—the one which would invoke the lesser penalty. Under subsection (3) the maximum penalty for attempt armed robbery would be ten years; under subsection (4) the maximum penalty would be three years.

■■ The statute is ambiguous and must be construed, if possible, to avoid the ambiguity. A construction which will render a statute absurd or self-contradictory will be avoided. (*People v. Hudson* (1970), 46 Ill.2d 177, 263 N.E.2d 473.) The aim of statutory construction is to ascertain the legislative intent by examining not only the language employed, but the objective sought to be accomplished. (*People v. LaPorte* (1960), 28 Ill.App.2d 139, 171 N.E.2d 95.) If the language is susceptible of more than one construction, the statute should receive the construction that will effectuate its purpose rather than defeat it. *Scofield v. Board of Education* (1952), 411 Ill. 11, 103 N.E.2d 640.

In light of the amendment's purpose, attempted robbery should fall under subsection (3). If it were otherwise, there would result, contrary

to what we believe to have been the legislature's intention, substantial reductions of sentences for all attempts to commit forcible felonies.

■■■ In order to effectuate the legislative intent and correct what appears to have been an inadvertent oversight, the phrase "and (3)" must be added to subsection (4). A court may construe a statute, even one which is penal in nature, so as to supply a missing, palpably omitted word or words so that a material aspect of the statute's purpose may be accomplished. (*People ex rel. Cason v. Ring* (1968), 41 Ill.2d 305, 242 N.E.2d 267; *People v. Spencer* (1971), 131 Ill.App.2d 551, 268 N.E.2d 192.) Accordingly, we construe subsection (4) as reading:

> (4) the attempt to commit any offense other than those specified in subsections (1), (2) *and* (3) hereof shall not exceed the sentence for a Class 4 felony.

(Contra: *People v. Scott* (1973), 14 Ill.App.3d 211, 302 N.E.2d 146.) Under this construction, the defendant's maximum sentence of six years is proper.

The defendant was proved guilty beyond a reasonable doubt of attempted robbery and aggravated battery and the identification testimony was properly admitted at the trial. However, the sentence for aggravated battery is vacated because that offense arose from the conduct comprising the attempt robbery. The sentence for attempt armed robbery, as corrected in our order for a changed *mittimus,* will remain in effect.

Affirmed as modified.

McNAMARA, P. J., and McGLOON, J., concur.